**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INFINITY COMPUTER<br>PRODUCTS, INC., | :<br>:<br>: |
| Plaintiff, | :<br>: No. 2:18-cv-01823-MKB-SMG<br>: |
| v. | :<br>: |
| CANON U.S.A., INC., | :<br>: |
| Defendant. | :<br>: |

**PLAINTIFF INFINITY COMPUTER PRODUCTS INC.'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

**Table of Contents**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND OF THE PATENTS-IN-SUIT ................................................ 2
       A. Technical Overview .................................................................................. 2
       B. RS232 Serial Communications ................................................................. 4
       C. Digital Communication Drivers ................................................................ 4
       D. The Extensive Examination of the Patents-in-Suit .................................. 4

III.   APPLICABLE LAW ........................................................................................... 5
       A. Claim Construction ................................................................................... 5
       B. Section 112, Paragraph 6 .......................................................................... 6
       C. Validity and The Definiteness Requirement ............................................ 7

IV.    INFINITY'S CLAIM CONSTRUCTION POSITIONS ...................................... 8
       A. Level of Ordinary Skill and Date of Invention ....................................... 8
       B. Categories of Claim Terms ....................................................................... 9
            1.   "facsimile machine"/"fax machine" (JCCPS Term Category 1) ...................... 9
            2.   The "Generic Send/Receive Driver Communications Software" Terms (JCCPS
                 2) ............................................................................................................... 11
            3.   "Using an Unmodified Standard Protocol for Shifting the Personal Computer
                 to a Connected Mode" .............................................................................. 14
            4.   The "By-passing or Isolating" Terms (JCCPS 4a-e) ...................................... 15
            5.   The "Facsimile Signals" Terms (JCCPS 5) .................................................... 17
            6.   "Using a Standard Protocol of the Facsimile Machine" (JCCPS 6) ................ 18
       C. Elements Canon Alleges are Subject to Section 112, Paragraph 6 ........................ 19
            1.   The "conditioning"/"conditioned" terms (JCCPS 7; 8a-k) ............................. 20
            2.   The "activating" terms (JCCPS 9a-g) ............................................................ 21
            3.   The "arranging" claim terms (JCCPS 10a-b) ................................................. 23
            4.   The "Enabling" Terms (JCCPS 11) ................................................................ 24

V.     CONCLUSION .................................................................................................. 24

# Table of Authorities

## Cases

*911EP v. Whelen Engineering Co., Inc.*,
    512 F. Supp.2d 713 (E.D. Tex., March 23, 2007) ................................................. 23

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
    830 F.3d 1341 (Fed. Cir. 2016) ........................................................................ 6

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363, 65 USPQ2d 1865 (Fed. Cir. 2003) ............................................ 22

*BASF Corp. v. Johnson Matthey Inc.*,
    875 F.3d 1360 (Fed. Cir. 2017) .................................................................. 8, 22

*Bed-Check Corp. v. Ultimate Safety, Inc.*,
    2003 U.S. Dist. LEXIS 27845 (N.D. Okla., Nov. 24, 2003) ................................ 21

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
    783 F.3d 1374 (Fed. Cir. 2015) ........................................................................ 8

*Brandywine Communications Technologies, LLC v. AT & T Corp.*,
    2014 WL 1569544, (N.D. Cal. 2014) ............................................................. 24

*Callpod, Inc. v. GN Netcom, Inc., et al.*,
    2009 U.S. Dist. LEXIS 51103 (N.D. Ill., Mar. 6, 2009)..................................... 21

*Carnegie Steel Co. v. Cambria Iron Co.*,
    185 U.S. 403 (1902)........................................................................................ 8

*ChemFree Corp. v. J. Walter, Inc., et al.*,
    Civil Case No. 1:04-CV-3711-JTC, 2007 WL 2071536 (N.D. Ga., July 17, 2007) ............ 23

*CIAS, Inc. v. Alliance Gaming Corp.*,
    504 F.3d 1356 (Fed. Cir. 2007) ..................................................................... 10

*Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*,
    838 F.3d 1224 (Fed. Cir. 2016), *cert. denied,* 137 S. Ct. 2267 (2017)................................. 20

*Fromson*, 755 F.2d at 1555 ................................................................................. 19

*Gillette Co. v. Energizer Holdings, Inc.*,
    405 F.3d 1367 (Fed. Cir. 2005) ..................................................................... 10

*Graham v. John Deere Co.*,
    383 U.S. 1, 33 (1966)........................................................................................ 5

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
    183 F.3d 1369 (Fed. Cir. 1999) ..................................................................... 14

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) ....................................................................... 6

*Johnson & Johnston Assoc. Inc. v. R.E. Serv. Co.*,
  285 F.3d 1046, 62 USPQ2d 1225 (Fed. Cir. 2002) ............................................................ 1

*Lemelson v. Gen. Mills, Inc.*,
  968 F.2d 1202 (Fed. Cir. 1992) ...................................................................................... 5

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).................................................. 5, 8

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998) ...................................................................................... 5

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S.Ct. 2120 (2014)................................................................................................... 7, 8

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
  161 F.3d 696 (Fed. Cir. 1998) ...................................................................................... 7

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ........................................................... 1, 5, 6, 10, 19

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Technology Limited*,
  346 F.Supp.3d 598 (S.D.N.Y., 2018) ............................................................................ 24

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*,
  753 F.3d 1291 (Fed. Cir. 2014) ...................................................................................... 10

*Southwestern Bell Telephone, L.P., et al. v. Arthur Collins, Inc.*,
  454 F. Supp. 2d 600 (E.D. Tex. 2006) ............................................................................ 17

*SynQor, Inc. v. Artesyn Technologies, Inc., et al.*,
  2010 WL 2881037 (E.D. Tex., Jul. 26, 2010) .................................................................. 17

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
  308 F.3d 1193 (Fed. Cir. 2002) ............................................................................... 21, 22

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
  733 F. App'x 1011 (Fed. Cir. 2018) ............................................................................ 14

*TriMed, Inc. v. Stryker Corp.*,
  514 F.3d 1256, 85 USPQ2d 1787 (Fed. Cir. 2008) ............................................................ 22

*Virnetx Inc. v. Cisco Systems, Inc.*,
  2012 WL 12547072,  (E.D. Tex., 2012) ............................................................................ 24

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ...................................................................................... 1

*Williamson*, 792 F.3d at 1348 ........................................................................................... 6, 7

*Zeroclick, LLC v. Apple Inc.*,
  891 F.3d 1003 (Fed. Cir. 2018) ..................................................................... 7, 20, 22, 23

Pursuant to the Court's Electronic Order of January 29, 2019 granting Motion for Discovery (Dkt. No. 113), Plaintiff Infinity Computer Products, Inc. ("Infinity" or "Plaintiff") hereby files this its Opening Claim Construction Brief, and in support thereof, state as follows:

## I.    INTRODUCTION

A consistent theme throughout this process is that Defendant seeks to import limitations from characterizations of specific examples in the specification to improperly narrow the scope of the claims.  It is the plain and ordinary meaning of the claims that set forth the "metes and bounds" of the patented inventions. *See, e.g., Johnson & Johnston Assoc. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc).  Accordingly, "the words of a claim 'are generally given their ordinary and customary meaning' ... that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims.  *Id.* at 1323.

Second, Canon's constructions ignore that the Patents-in-Suit have been repeatedly examined by the United States Patent & Trademark Office, including the Patent Trial and Appeal Board—at the insistence of Canon's joint defense group.  The defendants then sought and obtained a stay of the district court case in the Eastern District of Pennsylvania based principally on their purported deference to the subject matter experts at the USPTO.  Having now effectively lost those three rounds of reexaminations, Canon would disavow those proceedings entirely.  The dialogue with the Patent Office over the course of many years has resulted in substantial exposition as to the meaning of many of the claim phrases described below.  Moreover, the Patents-in-Suit have

been vetted to an extraordinary degree, including their definiteness, and the USPTO and PTAB directly supports Infinity's proposed constructions and the definiteness of the terms.

## II.     BACKGROUND OF THE PATENTS-IN-SUIT

### A.     Technical Overview

Plaintiff has asserted that Canon infringes multiple claims of U.S. Patent Nos. 6,894,811 (the "'811 patent"); 7,489,423 (the "'423 patent"); 8,040,574 (the "'574 patent"); and U.S. Patent No. 8,294,915 (the "'915 patent"). The '811, '423, '574, and '915 patents are collectively referred to as the "Patents-In-Suit."

Infinity is a pioneering company whose former technical lead, Mr. Bruce Nachman, now deceased, was the named inventor of the Patents-in-Suit. Infinity commercially released breakthrough products that allowed a single scanner and printhead to be leveraged for multiple functions. Infinity is now operated by Mr. Marv Nachman, the father of Bruce Nachman. The Patents-in-Suit teach an integrated system for communications between a facsimile machine and a PC in order to transfer scan and print data. This teaching corresponds to the primary features of modern fax-based multi-function printers, or "MFPs," also known as "All in Ones" (AIOs).

Bruce Nachman's advancement represented a breakthrough at the time of the invention: he recognized that the consolidation of a facsimile machine with generally distinct scan and printing capability using generic communication protocols was possible, thereby obviating the need for many separate devices. He did this by providing a bidirectional direct connection, for scan or print data flow, via a passive digital link between a facsimile machine and a PC. When in this mode the data flow bypasses or is isolated from the telephone line. At the time of the invention, most PCs were typically delivered with installed Windows or Apple operating system send receive generic communication software. Optionally, this generic software could be added to the PCs. The '558 Patent specification teaches using a group 1, 2, or 3 facsimile machine and analog and/or digital

transmission for sending scan or print data between the facsimile machine and the PC.  This method was made possible through the realization that standard fax machines based on emerging digital facsimile transmission standards could share data formats common to the data communications employed by personal computers.  Accordingly, the invention adopts generic communications protocols between the facsimile machine and the computer for the transfer of data for the purposes of printing and scanning with the facsimile machine.



Fig. 2g

In particular, as shown in the '811 patent in Fig. 2g, a Group 3 facsimile machine is connected via a bidirectional RS 232 digital passive link for transmission of scan and print data with a PC using generic send receive communication software, which is representative of a typical MFP today.

The '558 Patent specification teaches the use of digital connectivity with Group 3 facsimile machines, and PCs, in accordance with ITU recommendations T.4, T.6 and T.30.  This is further substantiated in Dr. Marc Levitt's Declaration ("Levitt Decl."), attached.  Group 3 Facsimile machines were developed for sending digitized documents over the General Switched Telephone Network (GSTN).  These facsimile terminals are now in widespread use around the world.  The

3

operation of Group 3 Facsimile terminals has been standardized in ITU-T Recommendations T.4, T.6 and T.30.

**B.** **RS232 Serial Communications**

RS232 is a form of digital serial communication. The specification and drawings of the Patents-in-Suit disclose digital signal communication between fax machine and computer, as explicitly held by the PTAB. *See* Decision on Appeal dated July 19, 2016, attached as Ex. 1 at 9-13. *See also* '811 Patent, Figs. 2f; 2g.

**C.** **Digital Communication Drivers**

Device drivers are low-level software used to facilitate the communications between the PC and other devices such as a fax machine. Levitt Decl., ¶¶34, 45. The device drivers and low-level driver software within the standard Microsoft Windows or Apple operating system frameworks are those which represent the generic elements referenced in the Nachman patents. *Id*.

The Patents-in-Suit's "generic send/rec driver communication software" refers to the common communication (i.e., "send/receive") elements used in certain of the asserted claims by scanning and printing applications for the transfer of image data between the PC and the fax machine.

**D.** **The Extensive Examination of the Patents-in-Suit**

Each of the Patents-in-Suit have been examined by the USPTO and had their patentability repeatedly confirmed through three separate reexaminations, concluding on July 31, 2012; March 25, 2014; and September 20, 2016 respectively. *See, e.g.,* '811 patent (attached as Ex. 2, *Ex Parte* Reexamination Certificates (found at the end of the patent document). It is rare that a litigated set of patents has been so thoroughly examined by the U.S. Patent & Trademark Office ("USPTO") and the Board of Patent Appeals (the "Board").

The claim construction task before the Court is thus relieved somewhat by the fact that many of the very same phrases before the Court by Defendant, including "generic," "passive," "protocol" and others have previously been construed by the United States Patent & Trademark Office during the lengthy reexamination process.

In 2016, upon completion of the third round of reexaminations, the Board found support in the original application all of the claims in the '811, '423, '574 and '915 patent claims, without change, and stated that the '558 patent incorporated all of the teaching to support their claims. In other words, the '558 patent taught how a fax machine could be linked with the PC without modification to material aspects of the facsimile machine consistently with the claims of the Patents-in-Suit. *See, e.g.,* Figs. 2b and 2d.

## III.   APPLICABLE LAW

### A.   <u>Claim Construction</u>

Claim construction is the first step in any infringement or validity analysis. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). A district court should construe the claims in light of their explicit language as informed by their preambles, as well as the patent's specification, figures, and prosecution history. *See Id.* at 980; *see also Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966).

The specification is the "best source for understanding a technical term," to be supplemented, "as needed, by the prosecution history." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998)). The prosecution history represents key evidence of how the examiner and the inventor construed the patent. *See Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992).

It is improper to confine a claim to a particular embodiment; the claim language itself is paramount. *See, e.g., Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008); *accord Phillips,* 415 F.3d at 1325 (favoring plain and ordinary meaning of the claim language over importing limitation from the preferred embodiment). Extrinsic evidence may also be relevant to claim construction. *See Phillips,* 415 F.3d at 1317. Such evidence consists of all evidence extrinsic to the patent and its prosecution history, including "expert and inventor testimony, dictionaries, and learned treatises." *Id.* (internal quotation omitted). While authorizing examination of extrinsic evidence, the Federal Circuit has warned that while it "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.*

### B.  Section 112, Paragraph 6

"To determine whether § 112, paragraph 6 applies to a claim limitation, our precedent has long recognized the importance of the presence or absence of the word 'means.'" *Williamson*, 792 F.3d at 1348.[1]  The absence of the word "means" creates a rebuttable presumption that § 112, ¶ 6 does not apply. *Id.*  The presumption can be overcome, and § 112, ¶ 6 will apply, "if the challenger *demonstrates* that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (emphasis added) (internal quotation marks, brackets, and citation omitted); *see also Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016) ("In determining whether this presumption has been rebutted, the challenger must establish by a preponderance of the evidence that the claims are to be governed by § 112, ¶ 6.").

---

[1] Of course, since all of the asserted claims here are method claims, the step-plus-function language of 35 U.S.C. Section 112, paragraph 6 applies here.  The Federal Circuit has not differentiated treatment between "step" and "means" in this context.

When evaluating whether a claim limitation invokes § 112, ¶ 6, the essential inquiry remains whether, in the context of the entire claim, "the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348; *Greenberg*, 91 F.3d at 1583 ("What is important is ... that the term, as the name for structure, has a reasonably well understood meaning in the art."). That determination must be made under the traditional claim construction principles, on an element-by-element basis, and in light of evidence intrinsic and extrinsic to the asserted patents. *See, e.g.*, *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 702–04 (Fed. Cir. 1998).

**Where none of the limitations at issue uses the word "means," presumptively, § 112, ¶ 6 does not apply to the limitations**. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007–08 (Fed. Cir. 2018). In *Zeroclick*, Apple argued that the limitations must be construed under § 112, ¶ 6, but provided no evidentiary support for that position. Accordingly, Apple failed to carry its burden, and the presumption against the application of § 112, ¶ 6 to the disputed limitations remained unrebutted. The district court's discussion is revealing: its determination that the terms must be construed as means-plus-function limitations is couched in conclusory language. The court relied on Apple's arguments, contrasting them against Zeroclick's contentions, but pointed to no record evidence that supports its ultimate conclusion regarding whether § 112, ¶ 6 applies to the asserted claims. The court thus legally erred by not giving effect to the unrebutted presumption against the application of § 112, ¶ 6.

## C.   Validity and The Definiteness Requirement

The Supreme Court in *Nautilus, Inc. v. Biosig Instruments, Inc*. held that a patent claim is indefinite if, when "read in light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the

scope of the invention."  572 U.S. 898 (2014).  "Reasonable certainty" does not require "absolute or mathematical precision."  *Biosig Instruments, Inc. v. Nautilus, Inc*., 783 F.3d 1374, 1381 (Fed. Cir. 2015).

It is important to note that patents are "not addressed to lawyers, or even to the public generally," but rather to those skilled in the relevant art.  *Carnegie Steel Co. v. Cambria Iron Co*., 185 U.S. 403, 437 (1902) (also stating that "any description which is sufficient to apprise [steel manufacturers] in the language of the art of the definite feature of the invention, and to serve as a warning to others of what the patent claims as a monopoly, is sufficiently definite to sustain the patent").  Defendant has the burden of proving indefiniteness by clear and convincing evidence. Id. at 1377.  *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

The Supreme Court has held that a phrase in not indefinite if it is "precise enough to afford clear notice of what is claimed, [and] thereby 'apprise the public of what is still open to them.'" *Nautilus*, 134 S. Ct. at 2129 (quoting *Markman v. Westview Instruments, I*nc., 517 U.S. 370, 373 (1996) (alterations omitted).  Under the standard set forth in *Nautilus*, claims are not indefinite when, viewed in light of the specification and prosecution history, they inform a person of ordinary skill about the scope of the invention with reasonable certainty.  *Id*.

## IV.     INFINITY'S CLAIM CONSTRUCTION POSITIONS

### A.      Level of Ordinary Skill and Date of Invention

Infinity contends that that the level of ordinary skill in this art at the time of filing of the Patents-in-Suit would have been someone with at least a B.S. in electrical engineering or equivalent, or at least 3 years of experience in the field of designing telecommunications systems or driver and embedded software.

### B. __Categories of Claim Terms__[2]

1. *"facsimile machine"/"fax machine" (JCCPS Term Category 1)*

| Term/Phrase | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "facsimile machine" / "fax machine"<br><br>'811, cl. 1, 2, 4, 6, 7, 18-20<br>'423, cl. 1-4, 6<br>'574, cl. 1, 2, 4, 5, 7, 8<br>'915, cl. 1, 7-9, 15 | No construction necessary; or<br><br>a device that is capable of sending and receiving a fax, including associated scan and print functionality. | a device that transmits scanned information, or receives information for printing, only using Group I, II, III, or IV international facsimile standards |

Defendant's proposed construction would take a relatively simple, understandable pair of words and turn them into a list of unsupported exclusionary limitations: i.e., "only using." Their treatment of this simple phrase is exemplary of Defendant's overarching approach of adding many limitations that are not present in the claims.

Among the limitations Defendant would add to this simple phrase are the following:

1. Transmits scanned information only in compliance with a CCITT/ITU-T facsimile standard; and

2. Receives information for printing only in compliance with a CCITT/ITU-T facsimile standard.

Neither is required by the claim language, and neither is an appropriate addition to the claim. Indeed, it is inaccurate to say that facsimile machines must communicate with this standard. *See* Levitt Decl., ¶¶53-54.

Further, the limitation "only" that Canon injects is in conflict with black letter patent law, which provides that claims are generally directed to what is required, not what is excluded. *See*

---

[2] As noted in the Joint Claim Construction and Prehearing Statement, Canon has selected an extraordinary number of claim terms for construction, rendering a 25-page limit and individualized treatment of each term impracticable. In order to make analysis of the intrinsic and extrinsic evidence somewhat efficient, Infinity has adopted Canon's classification of terms for briefing and argument purposes. It does not waive the differences in the claim language and surrounding context of the claims.

*CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) (addition of elements to infringing core infringes).   That is particularly true where, as here, the claim includes open-ended "comprising" language in the preamble.   Open claim language, such as the word "comprising" as a transition from the preamble to the body of a claim, "signals that the entire claim is presumptively open-ended."  *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005).

The capability to communicate in accordance with a CCITT/ITU-T recommendation or standard does not entail that no other communication capability can be provided or used.

> [A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. *See, e.g., Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification").

*Phillips*, 415 F.3d at 1323; *cf.* Levitt Decl., ¶¶53-54.   Here, as noted above, other forms of communication such as RS-232 are disclosed.   Indeed, it is common that facsimile machines (including Canon's) have USB or other ports to send, receive or store scan and print data.

The oft-attempted practice by accused infringers of adding words to actual claim language has been repeatedly rejected by the Federal Circuit.   *See Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("Source added words to the actual claim language, thus changing the relevant comparison from the slot to the diameter of the rod to the slot to the diameter of the rod added to the thickness of the container folded over it.   Instead of looking to the words themselves, Source added language without support from the specification or prosecution history, altering otherwise unambiguous claim language, a practice this court has repeatedly rejected.").

2.      The *"Generic Send/Receive Driver Communications Software"* Terms
*(JCCPS 2)*

| Term/Phrase | Plaintiff's Construction | Defendants' Proposed |
|---|---|---|
| "generic send/receive driver communications software" / "generic send receive driver communications software" / "generic send or receive communications software" / "generic send and receive driver communications software" / "generic send/receive communications software" / "generic send driver communications software"<br><br>'811, cl. 1, 6, 18-20<br>'423, cl. 1, 2, 6<br>'574, cl. 1, 7, 8<br>'915, cl. 1, 9 | driver communications software capable of interfacing with a facsimile machine using standard communications protocols on a standard PC.<br><br>This phrase would be understood in accordance with its plain and ordinary meaning to a person of skill in the art. The plain and ordinary meaning of the term "generic" is: relating to, or characteristic of a whole group or class. | Each of the claim phrases as a whole is indefinite under 35 U.S.C. § 112, second paragraph. Alternatively, within this claim term, a person of ordinary skill in the art would understand that the term "generic" at least means: off-the-shelf and neither customized, proprietary, nor manufacturer-specific. Further, within this claim term, a person of ordinary skill in the art would understand that the terms "send/receive driver communications software" … at least mean: software that controls a peripheral (such as, a facsimile machine) and provides all instructions necessary to accomplish the tasks of printing from the personal computer to the facsimile machine and/or scanning from the facsimile machine to the personal computer. |

Canon's complex and the term "generic" with respect to "send/receive driver communication software" was added as part of an explicit dialogue between the U.S. Patent & Trademark Office and the Applicant.  At the conclusion of that dialogue, the USPTO agreed with and accepted the definition of the term "generic" and confirmed all patent claims in which the term appeared.  There is no indefiniteness or uncertainty with respect to what generic means or that to which it is applied.

The USPTO Examiner explicitly adopted this definition in the Reexamination Determination.

> The Examiner in the '816 reexamination found claims 1-6 and 18-20 of the '811
> patent patentable based upon a new interpretation of the claimed *generic* send/receive
> driver communications software, as argued by the Patent Owner in response to the final
> rejection, and supported by the first Levitt Declaration (see response filed 30 December
> 2013, pages 7-17).  In allowing claims 1-6 and 18-20, the Examiner adopted the following
> interpretation for this feature: **a group or class of send/receive driver communications**
> **software capable of interfacing with a standard/conventional facsimile machine**
> **using standard communication protocols on a standard PC**.

June 19, 2014 Reexam Determination (re: '811 patent) at 15 (emphasis in original) (attached as

Ex. 3); *see also Ex Parte* Reexamination Advisory Action dated May 7, 2015 at 6 ("As noted in

the final Office action, the term "generic" was construed to mean that the claimed software is

"capable of interfacing with a standard/conventional facsimile machine using standard

communication protocols on a standard PC.") (attached as Ex. 4).

In the reexamination proceedings, the USPTO explicitly acknowledged that the patentee

asserted that generic was applied to communications rather than the entirety of the software.  It

laid out that understanding explicitly below.

> Here, the patent owner argues that the term "generic" was added to the claims to
> describe the "send/receive driver communications" rather than the "software" itself.
> The patent owner argues that the software implements the communications and that "it
> is the communications that comply with the standards."  In other words, the patent
> owner argues that the claims are directed to software that implements "generic
> send/receive driver communications."  See the patent owner's remarks filed on April 13,
> 2015 at pages 5-6.

Ex. 4 at 7.   After setting forth his understanding of Infinity's position and the entirety of the intrinsic record, the Examiner agreed with and adopted it:

> After considering the evidence and record as a whole, the examiner finds that the patent owner's arguments are persuasive.  Thus, the examiner agrees that the "generic send/receive driver communications software" limitation is adequately supported in the originally filed disclosure of the '278 application.

*Id.* at 8 (emphasis added).

Dr. Marc Levitt provided a Declaration in connection with the reexamination of the '811 patent.   In it, Dr. Levitt agrees with the Examiner that "generic" means "relating to, or characteristic of a whole group or class."  *See* Declaration of Dr. Marc E. Levitt dated Dec. 27, 2013 (attached as Ex. 5); Declaration of Dr. Marc E. Levitt dated Nov. 2, 2014 (attached as Ex. 6). This definition is found in the contemporaneous IBM Dictionary of Computing (10th Ed. August 1993) (attached as Ex. 7).

That "generic" was added during *Ex Parte* Reexamination and was blessed by the Examiner weigh heavily in Infinity's favor in this analysis.   A recent case decided by the Federal Circuit had similar facts and explicitly held.

> *The prosecution history provides further evidence that the claim term is not indefinite. As stated above, the original claims of the application that issued as the '066 patent did not contain the disputed claim term. Rather, the examiner added the language in an examiner's amendment in the Notice of Allowance*. In the examiner's reasons for allowance, the examiner stated that these additions "define a configuration and functional capability of the elastic fasteners that is not taught by [the prior art]. In particular, the language beginning with 'such that shaking ...' defines an upper limit of the connecting force and thus defines the elastic fastener in a way that distinguishes over [the prior art]." J.A. 107–08.
>
> The examiner's own remarks confirm that the claim language informs a person of ordinary skill of the objective boundaries of the claim term. Additionally, we presume that an examiner would not introduce an indefinite term into a claim when

he/she chooses to amend the claim for the very purpose of putting the application in a condition for allowance. *See Northern Telecom, Inc. v. Datapoint Corp*., 908 F.2d 931, 939 (Fed. Cir. 1990) ("It is presumed that public officials do their assigned jobs"). ***Thus, we find that the '066 patent is not indefinite under the Nautilus standard because the claims, viewed in light of the specification and prosecution history, inform a person of ordinary skill about the scope of the invention with reasonable certainty***.

*Tinnus Enterprises, LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1019 (Fed. Cir. 2018) (emphasis added).

With respect to "send/receive driver communication software," Canon's construction is (1) improperly taken out of the context of the claim; and (2) has no support in the intrinsic record, and must be rejected.  Claim terms are not interpreted in a vacuum, devoid of the context of the claim as a whole.  *See Hockerson-Halberstadt, Inc. v. Converse Inc*., 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("proper claim construction ... demands interpretation of the entire claim in context, not a single element in isolation.").  The "generic" aspect of the software is limited to the send/receive driver communications.  *See* Levitt Decl., ¶¶34-39; 54-55; 72-83.  The expert of Epson, Canon's co-defendant, acknowledged that it is not all driver software, but only the send/receive elements (e.g., RS-232) that must be generic not "all software that controls a peripheral."  Ex. 8 at 186:15-187:22.

3. *"Using an Unmodified Standard Protocol for Shifting the Personal Computer to a Connected Mode"*

| Term/Phrase | Plaintiff's Construction | Defendant's Construction |
| --- | --- | --- |
| "using an unmodified standard protocol for shifting the personal computer to a connected mode"<br><br>'811, cl. 7 | No construction necessary; Infinity contends that this phrase would be understood in accordance with its plain and ordinary meaning to a person of skill in the art. | Indefinite.  Alternatively, this term at least means: using an unaltered set of rules that comply with Group I, II, III, or IV international facsimile standards to change the computer to a state that can send signals to or receive signals from a facsimile machine |

No specific protocol is identified in the claim.  The claim language, which controls, notes that the protocol must be unmodified and standard.  The claim language is thus intentionally agnostic as to the unmodified standard protocol used.  Defendant's proposal would mandate a specific set of instructions, "a facsimile standard promulgated by the CCITT/ITU-T," which is not claimed.

The patent also discloses other protocols for shifting a personal computer to a connected mode, including RS232.  '811 patent, Fig. 2g; *see also, e.g.,* '811 patent, 6:38-40; 6:51-54; 8:7-13; claim 8.  RS-232 is a standard communication protocol for linking computer and its peripheral devices to allow serial digital data exchange (e.g., EIA/TIA-232-E).  In simple terms, RS232 defines, among other things, the signaling voltages representing 0s and 1s of the digital data transmission for the path used for data exchange between the devices.  Levitt Decl., ¶¶117, 123.

4.      *The "By-passing or Isolating" Terms (JCCPS 4a-e)*

| Term/Phrase | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "by-passing or isolating the facsimile machine and the computer from the public network telephone line" '811, cl. 1, 6 | No construction necessary; *or* the data flow of the scan and print data circumvents the public network telephone line | physically disconnecting the facsimile machine and the computer from the public telephone network |
| "said facsimile machine by-passing or isolated from the public network telephone line" '811, cl. 2 | | the facsimile machine having been physically disconnected from the public telephone network |
| "both the facsimile machine and personal computer isolated from said at least one public network telephone line" '811, cl. 7 | | the facsimile machine and the computer having been physically disconnected from the public telephone network |
| "when isolated from the telephone line" '811, cl. 18, 19 | | when physically disconnected from the public telephone network |

| | | |
|---|---|---|
| "both the facsimile machine and computer by-passing or isolated from said at least one public network telephone line" '811, cl. 20 | | the facsimile machine and the computer having been physically disconnected from the public telephone network |

Here, Canon would replace the two terms "bypassing" or "isolating" with "physically disconnecting."  The apparent purpose of the replacement of the two claim terms is to generate a noninfringement defense based on the requirement that something must be physically disconnected, as opposed to electrically bypassed or isolated, meaning the absence of an electrical path.  Defendant's modification of the plain and ordinary meaning of the claim language should be rejected.[3]

Most of the claims incorporate two terms: "isolating" and "bypassing."  Defendants ignore differences between the two.  *See, e.g.*, claims 1 and 20 of the '811 Patent.  In claim 7 of the '811 Patent, only "isolating" appears in the claim. *See* Ex. 2.  At times in the specification, the word "disconnected" is used to explain how the circuit of Fig. 1 isolates the signal flow; also used are the terms "coupled" and "decoupled."   Ex. 2 at 5:40-44; 8:33-39.  In either case, a person of ordinary skill in the art would understand that physical or logical disconnection are encompassed by the words.  *See* Ex. 9 at ¶¶141-142.  Dr. Melen, the expert of Canon's co-defendant Epson, agreed that "bypass" does not require a physical disconnection. Ex. 10 at 118:17-119:18 (testifying that the idea of isolating doesn't require disconnection but is more akin to rerouting vehicular traffic).

---

[3] It should be noted that although these terms appear in the '811 patent, neither term appears in the '915 patent, '574 patent, or U.S. Patent No. 7,489,423 (the "'423 patent), which is a divisional of application No.08/669,056, now U.S Patent No. 6,894,811.  *See, e.g.,* claim 6, of the '423 patent for scanning and printing, effectively not using the bypass and isolation terminology, after its issue date of February 10, 2009.

What a person of skill would understand by these terms is that the public telephone line is removed from the data flow of the scan data or in other words, the image data does not need to make use of the public telephone network to connect between a fax and PC that are in many cases side-by-side on a desktop but that data can take a more direct path (i.e., the passive link). A similar determination was made in *Southwestern Bell Telephone, L.P., et al. v. Arthur Collins, Inc*., 454 F. Supp. 2d 600 (E.D. Tex. 2006), in which "bypass" was construed as "a structure and path by which data channels completely go around and in no respect go through the TST switch." Similarly, "isolating" has been construed in accordance with Infinity's proposal: "the absence of an electric path permitting the flow of DC current (other than a *de minimus* amount) between an input and an output of a particular stage, component, or circuit." *SynQor, Inc. v. Artesyn Technologies, Inc., et al.*, 2010 WL 2881037 (E.D. Tex., Jul. 26, 2010).

5.      *The "Facsimile Signals" Terms (JCCPS 5)*

| Term/Phrase | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "facsimile signals" / "facsimile machine signal" / "digital facsimile signals of the scanned document" / "facsimile machine communications signals" / "facsimile format" / "a standard facsimile machine format"<br><br>'811, cl. 1, 6, 7, 18, 19<br>'915, cl. 1, 9 | No construction necessary. | signal(s)/format in compliance with Group I, II, III, or IV international facsimile standards |

Infinity contends that "facsimile signals" requires no construction. They are signals of or generated by a facsimile machine, whether analog or digital. Levitt Decl., ¶¶84-100; Ex. 1 at 9-13. "Facsimile machine" is construed *supra*. Defendant's construction can be rejected for at least two reasons: (i) the construction would require transmission ("transmit data") when several of the

terms that Defendant lumps into this category have no such requirement; and (ii) they require a specific signal encoding, namely "a facsimile standard promulgated by the CCITT/ITU-T."

The latter requirement is not present in the claims and should be rejected.  *See also* Levitt Decl., ¶¶53-54.  Moreover, part of the invention is that generic communications are provided by the facsimile machine.  These generic communications need not be encoded in accordance with "a facsimile standard promulgated by the CCITT/ITU-T."   Instead, they must simply comprise facsimile signals and as clarified in many instances, it is the transfer of the image data representing the scanned or printed document that is of central importance.  Levitt Decl., ¶¶83-89.

6.    *"Using a Standard Protocol of the Facsimile Machine" (JCCPS 6)*

| Term/Phrase | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "using a standard protocol of the facsimile machine"<br><br>'915, cl. 1 & 9 | No construction necessary;<br><br>*or*<br><br>using a standard set of rules that are supported by the facsimile machine. | using a set of rules that comply with Group I, II, III, or IV international facsimile standards |

The parties agree that a protocol is a set of rules.  Defendant's proposal, however, changes the meaning of the claim language in several particulars.  The context of claim 1 of the '915 patent indicates that the "standard protocol of the facsimile machine" is used for receiving a print instruction from the computer:

> ***receiving an instruction*** at the digital communications port from the computer to place the facsimile machine into a print mode, ***the instruction being received using a standard protocol of the facsimile machine***;

'915 patent, claim 1 (emphasis added).  In accordance with the plain and ordinary meaning of the claim language, any standard protocol can be used for this purpose.  Levitt Decl., ¶¶90-93.

Secondly, and a recurring theme of Defendant's proposals, is that Defendant would limit the "standard protocol of the facsimile machine" to a specific unclaimed protocol, namely: a

"facsimile standard promulgated by the CCITT/ITU-T."  Canon thus repeats its attempt to insert a restrictive limitation in yet another phrase in which it does not appear.  The limitation should not be narrowed by limiting it to a single such standard, which would run afoul of the seminal claim construction case, *Phillips*:

> [A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. *See, e.g., Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification");

*Phillips,* 415 F.3d at 1323.

### C.    Elements Canon Alleges are Subject to Section 112, Paragraph 6

Canon urges the blanket position that each of some **21 phrases are subject to Section 112**, paragraph 6 **despite none of their using language consistent with that paragraph and thus in opposition to a legal presumption**.  Can is incorrect and its wide-ranging and unfocused arguments on this topic have rendered the claim construction process unwieldy, perhaps intentionally so.

As set forth above, the Patents-in-Suit have been repeatedly examined by the USPTO—both originally and in reexamination initiated by Canon's joint defense group—and further examined by the Board, the highest-level administrative body charged with reviewing patents in the United States.  At no time did any of those bodies treat these claim terms as subject to Section 112, paragraph 6, or find them in any way indefinite.  The PTO's findings during reexamination are "evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence."  *Fromson*, 755 F.2d at 1555.

Infinity is confident that none of these terms are properly subject to Section 112, paragraph 6.  None uses the word "means" "or step," and all are thus subject to a presumption that Section 112, paragraph 6 does not apply.  Canon has failed to overcome that presumption.  If for some

19

reason the Court disagrees, Infinity requests an opportunity to provide further briefing about the corresponding structure in the specification, which is adequate in any case, before any determination of invalidity under Section 112, which is tantamount to a dispositive motion. Exemplary teaching relating to these issues is set forth in the Levitt Declaration, paragraphs 112-124.

### 1. The "conditioning"/"conditioned" terms (JCCPS 7; 8a-k)

Not one of these 11 phrases adopt means-plus-function language and presumptively does not invoke section 112, paragraph 6. "Conditioning" is not subject to Section 112, paragraph 6. It has a meaning to a person of ordinary skill in the art, namely bringing into the desired state – so putting into the send/receive mode. Levitt Decl., ¶¶107-08. One such way that is taught in the patent specification is the use of RS232 digital serial communications. "Conditioning" has known meaning to a person of ordinary skill in the art and does not give rise to the application of Section 112, paragraph 6. *See Zeroclick,*, 891 F.3d at 1008.

Defendant seems to assert that the inclusion of functional language in a claim renders it subject to Section 112, paragraph 6, and/or renders it indefinite. They are incorrect in that assertion.

> Cox nevertheless contends that "processing system" is indefinite because the asserted claims only describe it in functional terms. We disagree. Claims are not per se indefinite merely because they contain functional language.[4] *See also Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (citing *Halliburton Energy Servs., Inc. v. M–I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008)) ("[A]pparatus claims are not necessarily indefinite for using functional language"). Indeed, here, functional language promotes definiteness because it helps bound the scope of the claims by specifying the operations that the "processing system" must undertake. All of the asserted claims are method claims, so it makes sense to define the inventive method as a series of functions.

*Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1232 (Fed. Cir. 2016), *cert. denied,* 137 S. Ct. 2267 (2017).

To the extent the Court determines that section 112, paragraph 6 applies notwithstanding this presumption, there is adequate corresponding structure/teaching disclosed in the specification to a person of skill in the art, including at '811 patent, figures; claims 1, 6, 18-19; 5:44-46, among others.  *See* Levitt Decl. 4, ¶¶104 *et seq.*  Canon has not yet provided an explanation for why this term is subject to Section 112, paragraph 6 or why it indiscriminately contends that every instance of the term is indefinite.  Infinity will respond if and when Canon demonstrates some sort of colorable basis for its position.

### 2.     The "activating" terms (JCCPS 9a-g)

Again, neither the words "means" and "step" are not used in the claims, giving rise to a presumption that Section 112, paragraph 6 does not apply. Canon has not rebutted and cannot rebut that presumption.

"Activating" is a term that would be understood to mean put in an active state, depending on the context of the claim.  It has been repeatedly construed in this manner by a host of courts in patent cases.  Contrary to the assertion of Defendant, the term "activating" is not a nonce word.  It has a readily ascertainable meaning known to a person of ordinary skill in the art in the context of this invention.  Levitt Decl., ¶104-106.  The following chart shows that "activating" has been construed repeatedly in other cases outside the scope of Section 112, paragraph 6.

| Phrase | Construction | Citation |
|---|---|---|
| **"activating"** | "starting the operation or turning on" | *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) |
| **"activates"** | "powers on the call pod" | *Callpod, Inc. v. GN Netcom, Inc., et al.*, 2009 U.S. Dist. LEXIS 51103 (N.D. Ill., Mar. 6, 2009) |
| **"activating"** | "setting in motion." | *Bed-Check Corp. v. Ultimate Safety, Inc.*, 2003 U.S. Dist. LEXIS 27845 (N.D. Okla., Nov. 24, 2003) |

In the *Texas Digital* matter, the Federal Circuit cogently observed "there is nothing in the record to suggest that 'activating' means other than what its dictionary definition would suggest, i.e., starting the operation or turning on." *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002).

In other words, here there is specific action disclosed for performing the function. ("Sufficient structure exists when the claim language specifies the exact structure that performs the function in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure."); *TriMed, Inc. v. Stryker Corp.,* 514 F.3d 1256, 1259-60, 85 USPQ2d 1787, 1789 (Fed. Cir. 2008); *see also Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1376, 65 USPQ2d 1865, 1874 (Fed. Cir. 2003).

> But the *Nautilus* standard of "reasonable certainty" does not exclude claim language that identifies a product by what it does. Nothing inherent in the standard of "reasonable certainty" precludes a relevant skilled artisan from understanding with reasonable certainty what compositions perform a particular function. Not surprisingly, we have long held that nothing in the law precludes, for indefiniteness, "defining a particular claim term by its function." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374–75 (Fed. Cir. 2014).

*BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1366 (Fed. Cir. 2017).

An instructive case is the Federal Circuit's recent ruling in *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018), in which the district court was reversed for treating the words "program" and "user interface code" as nonce words.

> By taking that approach, the district court effectively treated "program" and "user interface code" as nonce words, which can operate as substitutes for "means" and presumptively bring the disputed claims limitations within the ambit of § 112, ¶ 6. *That is erroneous for at least three related reasons. First, the mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions*. *See Greenberg*, 91 F.3d at 1583 ("Many devices take their names from the functions they perform. The examples are innumerable, such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.' "). *Second, the court's analysis removed the terms from their context, which otherwise strongly suggests the plain and ordinary meaning of the terms*. Claims 2 and 52 of the '691 patent, for example, recite "[a] graphical user

22

interface," which their preambles make clear, may comprise "an update of an *existing* program" using a two-step method. *See, e.g.*, '691 patent, col. 81 ll. 6–28 (emphasis added).

*Zeroclick, LLC v. Apple Inc*., 891 F.3d 1003, 1008 (Fed. Cir. 2018).

A person of ordinary skill would understand that "activating" has a meaning in the context of the claims.  *See* Levitt Decl., ¶¶104 *et seq.*

> ### 3.    The "arranging" claim terms (JCCPS 10a-b)

Arranging is not subject to Section 112, paragraph 6.  It means organizing in a particular order or configuration.  *See* Levitt Decl., ¶¶109-110.  Indeed, the meaning of "arranging" is so well known that it is hard to understand how Defendant can muster a serious position that it is a nonce word, or lacks meaning, or otherwise rebuts the presumption that Section 112, ¶6 does not apply.

For example, a district court has previously construed "arranged about" as not subject to Section 112, paragraph 6, and meaning "placed or set in a specific order."  *911EP v. Whelen Engineering Co., Inc.*, 512 F. Supp.2d 713 (E.D. Tex., March 23, 2007).  In another case involving some functional language, "arranged" was not subject to Section 112, paragraph 6 treatment.  In that case, "the heater is constructed and arranged to add heat to the fluid while the fluid is disposed within the tank" was construed to mean "the heater warms the cleaning fluid while the cleaning fluid is in the tank."  *ChemFree Corp. v. J. Walter, Inc., et al.*, Civil Case No. 1:04-CV-3711-JTC, 2007 WL 2071536 (N.D. Ga., July 17, 2007).

As set forth in greater detail above, the digital communications teachings throughout the specification are many that should be understood as relevant to these terms are many.  For example, RS-232 is a digital serial communication technology that is repeatedly discussed throughout the specification and shown in the drawings.  *See, e.g.*, '811 patent, Figs. 2e, 2g; *see also, e.g.,* '811 patent, 6:38-40; 6:51-54; 8:7-13; claim 8.  Levitt Decl., ¶¶109-110.

4.      The "Enabling" Terms (JCCPS 11)

As with respect to the above terms, there is no presumption of the application of Section 112, paragraph 6 for "enabling."   It appears routinely in patent claims and means making the recited operation technically possible within the system.  The term has been repeatedly construed as not subject to Section 112, paragraph 6, including by this Court within the last year.  *See, e.g., SIMO Holdings Inc. v. Hong Kong uCloudlink Network Technology Limited*, 346 F.Supp.3d 598, 604 (S.D.N.Y., 2018) (applying plain and ordinary meaning: "uCloudlink argues that the jury will not understand what it means to "enable an initial setting," but the Court disagrees, especially given that the jury need not understand the phrase in isolation but only needs to understand what the phrase means in the context of the claims."); *see also Brandywine Communications Technologies, LLC v. AT & T Corp.*, 2014 WL 1569544, at *14 (N.D. Cal. 2014) (applying plain and ordinary meaning to "enabling"); *Virnetx Inc. v. Cisco Systems, Inc.*, 2012 WL 12547072, at *14 (E.D. Tex., 2012) ("the Court finds that this term does not require construction"); *accord* Levitt Decl., ¶¶109-110.

Canon's real argument appears to be that the term is not itself enabled under Section 112. Infinity is confident that such an argument, if raised in the proper context, would fail—indeed, it recites a fair amount of enabling disclosure itself in the JCCPS.  *See id*. at 34-35.

V.      **CONCLUSION**

For the foregoing reasons, in view of the patent specifications, drawings, prosecution histories and claims, and the extrinsic evidence of record in this brief and the Joint Claim Construction and Prehearing Statement, Infinity submits that its claim constructions should be adopted.

Dated: May 15, 2019

Respectfully submitted,

*/s/   Andrew G. DiNovo*
Andrew G. DiNovo (admitted *pro hac vice*)
Nicole E. Glauser (admitted *pro hac vice*)
Adam G. Price (admitted *pro hac vice*)
Christopher V. Goodpastor (admitted *pro hac vice*)
Gabriel R. Gervey (admitted *pro hac vice*)
DiNovo Price LLP
7000 N. MoPac Expressway, Suite 350
Austin, Texas 78731
Telephone: (512) 539-2626
Facsimile:  (512) 539-2627
adinovo@dinovoprice.com
nglauser@dinovoprice.com
aprice@dinovoprice.com
coodpastor@dinovoprice.com
ggervey@dinovoprice.com


Andrew L. Crabtree
The Law Offices of Andrew L. Crabtree, P.C.
225 Broadhollow Road, Suite 303
Melville, New York 11747
Telephone: (631) 753-0200
Facsimile: (631) 753-0950

**Counsel for Plaintiff**
**Infinity Computer Products Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was electronically filed on May 15, 2019 with the Court's CM/ECF system, which will automatically serve the following counsel of record for Defendant electronically via e-mail:

Brian L. Klock                    Michael P. Sandonato
Jason M. Dorsky                   Venable, LLP
David D. Leege                    1290 Avenue of The Americas
Venable, LLP                     New York, NY 10104
600 Massachusetts Avenue, NW      MSandonato@venable.com
Washington, DC 20001
bklock@venable.com
jmdorsky@venable.com
ddleege@venable.com


                                 */s/  Andrew G. DiNovo*
                                 Andrew G. DiNovo